IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELITE PROTECTIVE SERVICES, INC.,        *

     Plaintiff,        *

v.        *        Case No. TJS-22-0974

INTERNATIONAL GUARDS UNION OF        *
AMERICA, LOCAL 154,
        *
     Defendant.

*        *        *        *        *        *

**MEMORANDUM OPINION**

This case is assigned to me for all proceedings by the consent of the parties, pursuant to 28 U.S.C. § 636(c). ECF No. 16. Currently pending before the Court is the "Motion to Dismiss Amended Complaint to Vacate Arbitration Opinion and Award and Defendant's Petition for Confirmation of Arbitration Opinion and Award" ("Motion") (ECF No. 22) filed by Defendant International Guards Union of America, Local 154 (the "Union"). Having considered the parties' submissions (ECF Nos. 22 & 24), no hearing is deemed necessary. *See* Loc. R. 105.6. For the following reasons, the Motion will be granted in part and denied in part.

**I.      Background**

Plaintiff Elite Protective Services, Inc.'s ("Elite") Amended Complaint to Vacate Arbitration Opinion and Award (ECF No. 20) is the operative pleading. In its Amended Complaint, Elite "seeks an order vacating an arbitration Opinion and Award issued on March 22, 2022," on the grounds that the arbitration award "violates well established public policy," is the "product of misconduct by the Arbitrator," and is in "manifest disregard of the law." *Id.* at 1. Elite brings five claims under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, but all claims arise from the same alleged violations of 9 U.S.C. § 10(a)(3) and (4) by the arbitrator.

Because no reply was filed and the time to file one has passed, *see* Loc. R. 105.2, the Motion is ripe for decision.

## II.      Standard of Review

Rule 12(b)(6) permits a court to dismiss a complaint if it fails to "state a claim upon which relief can be granted." "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint, [and not to] resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotation marks omitted). A complaint must consist of "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When considering a motion to dismiss, a court must accept as true the well-pled allegations of the complaint and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). While a court must take the facts in the light most favorable to the plaintiff, it "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint generally "does not need detailed factual allegations." *Id.* So long as the factual allegations are "enough to raise a right to relief above the

2

speculative level," the complaint will be deemed sufficient. *Id.* A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

## III.   Discussion

### A.   Factual Allegations

For the purpose of this Motion, the Court accepts the factual allegations of the Amended Complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to Elite. *Ibarra*, 120 F.3d at 474.

Elite provides security services to federal government facilities in the greater Washington, D.C. metropolitan area. *Id.* The Union is the exclusive collective bargaining representative for Elite's employees working in a facility in Beltsville, Maryland. *Id.* at 2. Elite and the Union are parties to a collective bargaining agreement ("CBA"). *Id.* ¶ 4. A copy of the CBA was attached to Elite's initial Complaint and is incorporated into the Amended Complaint. ECF No. 1-3; Fed. R. Civ. P. 10(c); *Jeffrey M. Brown Assocs., Inc. v. Rockville Ctr. Inc.*, 7 F. App'x 197, 202 (4th Cir. 2001). Article 1 of the CBA provides that Elite's management has the right to discharge, discipline, or suspend employees "for just cause." *Id.* at 5. Article 18 of the CBA contains a three-step grievance procedure for disputes between Elite and the Union (and thereby the employees it represents). *Id.* at 14-15. If a grievance remains unsettled after step two of the process, the Union may "refer the grievance to arbitration." *Id.* at 15.

Article 19 of the CBA contains the arbitration procedure. This procedure provides that the parties will select an arbitrator by mutual agreement. If the parties cannot agree on an arbitrator, the "Union may file for arbitration with the Federal Mediation Conciliation Service." *Id.* at 16. If the Union files for arbitration with the Federal Mediation Conciliation Service ("FMCS"), the

arbitration is to "be handled in accordance with [the FMCS's] 'Voluntary Rules of Labor Arbitration.'"[1] *Id.* at 16.

In June 2021, the Union filed a grievance on behalf of Paul Ogordi ("Mr. Ogordi"), a former employee of Elite. ECF No. 20 ¶ 7. The grievance proceeded to arbitration and a hearing was held before an FMCS arbitrator on December 6, 2021. *Id.* During the hearing, Rene Sandler, Esq. ("Ms. Sandler") appeared as one of Elite's attorneys. *Id.* ¶ 8. On March 22, 2022, the arbitrator issued an Opinion and Award that found for the Union (and Mr. Ogordi) and against Elite. ECF No. 1-2 at 48. The Court finds that the arbitrator's Opinion and Award is integral to Elite's Amended Complaint, and will consider it in connection with the Motion. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

### B.     The Arbitrator's Opinion and Award

The arbitrator's 48-page Opinion and Award is divided into several sections. ECF No. 1-2. The arbitrator first summarizes the background of the grievance and the relevant provisions of the CBA. The arbitrator then summarizes the parties and their dispute, as well as a history of the proceedings. The arbitrator then summarizes the parties' contentions and the documentary and testimonial evidence presented during the arbitration hearing. Finally, the arbitrator explains his findings and conclusions.

The arbitrator found that Mr. Ogordi had worked for Elite for 16 years, during which he "was never disciplined nor the subject of an investigation" until the grievance at issue. ECF No. 1-2 at 6. He was promoted to a supervisory position in 2010. *Id.* As a provider of uniformed security services to federal government facilities, Elite is required to staff the facilities with guards who meet certain fitness and training requirements. *Id.* at 7. Elite requires its guards to "undertake

---

[1] The Voluntary Rules of Labor Arbitration are codified at 29 C.F.R. part 1404.

a variety of training courses on a routine, annual basis." *Id.* To this end, Elite provides "various subject matter classes of the training required for the guards" through a separate company called Guardian Academy Training Services ("Guardian"). *Id.*

Major Gerald Johnson ("Mr. Johnson") supervises the training of Elite's guards through Guardian. *Id.* at 8. He "maintains detailed records of guard training," including a record of all guards who have trained with him, the subject of the training classes, the date of the training classes, and the calendars of Elite's training schedules. *Id.* Mr. Johnson requires guards that attend training "to complete a sign in and sign out sheet," which he retains in his records. *Id.* To fulfill its contractual obligations with the federal government, Elite requires its guards to attend a mandatory 36-hour "Refresher Training" at least every three years. *Id.* Elite notifies their guards in advance when they are due to attend the mandatory training in accordance with the CBA. *Id.* at 8-9. Elite pays for the training of its employees. *Id.* at 9.

Mr. Johnson maintained Elite's training class calendars for 2018 and 2019. *Id.* Another employee of Elite, Yvette Peoples ("Ms. Peoples"), was responsible for certifying employee training in 2018 and 2019. *Id.* Ms. Peoples died in early 2020. *Id.* In May 2021, Elite learned of problems with some of its employees' training certifications. *Id.* at 9-10. Two other supervisor guards at the location where Mr. Ogordi worked—Janet Johnson and Nicole Lee—admitted to submitting falsified training certifications for mandatory Refresher Training in 2018. *Id.* For both employees the conduct was essentially the same: they signed certifications that they had attended mandatory Refresher Training for different dates in 2018, but they had not actually done so. *Id.* In fact, no Refresher Training courses were even offered on the dates that Janet Johnson and Nicole Lee had certified their attendance. *Id.* Mysteriously, the certification forms contained signatures

from Ms. People that (falsely) certified the employees' training. *Id.* Mr. Ogordi had "essentially the same type of certification in his file." *Id.* at 10.

Faced with losing its government contract because some of its employees had falsely certified their attendance at mandatory training, Elite launched an internal investigation. *Id.* at 11. Elite's outside counsel, Rene Sandler ("Ms. Sandler"), and Elite's Operations Manager, Clay (Justin) Katz ("Mr. Katz"), assisted with the investigation. *Id.*

Mr. Ogordi was summoned to attend a meeting with Elite management on May 28, 2021. *Id.* at 12. When he arrived, he was greeted by Ms. Sandler and Mr. Katz. *Id.* The purported purpose of the meeting was for Ms. Sandler and Mr. Katz to interview Mr. Ogordi about his training and the possibly-fraudulent certification of his 2019 Refresher Training. *Id.* The arbitrator found that the "parties differ[ed] in their versions as to what transpired during [the] three (3) part meeting." *Id.*

Mr. Ogordi testified that he was given no advance notice that the meeting was about his possible misconduct, that he was not warned that he could be subject to disciplinary action, and that Ms. Sandler led the questioning at the initial part of the meeting. *Id.* Mr. Katz, on the other hand, testified that he had notified Mr. Ogordi of the need for meeting "before May 28th," that he told him that the purpose of the meeting was "to look over some training 'Certs' (Certifications) together, and that Mr. Katz opened the meeting by informing Mr. Ogordi that he found "something suspicious" in Mr. Ogordi's files. *Id.* According to Mr. Katz, Mr. Ogordi declined his offer for a union representative to attend the meeting. *Id.* Mr. Katz stated that he "handled the overwhelming extent of the talking at the meeting." *Id.* Mr. Ogordi stated that Mr. Katz "asked him if he had attended training in 2019," and at some later point showed him a training certificate. *Id.* Mr. Ogordi testified that after he examined the training certificate, he said the signature "don't look like mine."

*Id.* at 12-13. Mr. Ogordi confirmed that the training certificate did not contain his signature after Ms. Sandler and Mr. Katz "said something about Ms. Peoples." *Id.* at 13.

The second part of the meeting took place in Mr. Johnson's office. *Id.* There, Mr. Johnson "reviewed his training records and calendar in the presence of Ogordi and Katz." *Id.* He "confirmed that Ogordi had not attended the 2019 Refresher Training." *Id.* Mr. Katz testified that Mr. Johnson's training records showed that the 2019 Refresher Training reflected in Mr. Ogordi's apparently fraudulent certificate had not actually been held. *Id.*

The third part of the meeting took place in Mr. Katz's office. *Id.* Mr. Katz testified Mr. Ogordi "for the first time said he was not sure it was his signature on the certification." *Id.* According to Mr. Katz, when he asked Mr. Ogordi if the training certificate contained his signature, Mr. Ogordi said he wasn't sure and "got very shifty, very uncomfortable." *Id.* Then, according to Mr. Katz, Mr. Ogordi confirmed that it was his signature. *Id.* Mr. Katz's testimony conflicted with Mr. Ogordi's testimony. The other person present during the first and third parts of the meeting, Ms. Sandler, did not testify during the arbitration hearing.

Mr. Ogordi testified that the meeting ended when Ms. Sandler and Mr. Katz told him that they would reschedule his training. *Id.* Mr. Ogordi completed Refresher Training on June 7-11, 2021. *Id.* On June 18, 2021, Mr. Ogordi received a letter from Elite terminating his employment effective immediately. *Id.* at 14. The letter explained that Elite was terminating Mr. Ogordi "due to dishonesty and conduct involving [his] knowing and willful submission of falsified training documents and failure to complete the required training." *Id.* The letter went on:

> On Friday, May 28, 2021 you met with Justin Katz and Gerald Johnson regarding the validity of your refresher certification. You could not identify who your instructor was or when you attended training. A review of Elite's training records and schedules revealed that you did not attend the training and your certification did not contain a signature from any instructor. When presented with this information you then represented that you had attended a physical in person training

on a particular date and time at Elite in May, 2019. There was no such training on or around the date that you provided. You could not provide any information about the training, number of people in the training or any other information.

*Id.* at 14.

Through the Union, Mr. Ogordi filed a grievance of his termination on June 18, 2021. *Id.* The grievance alleged that Mr. Ogordi had been discharged without just cause. *Id*.

The arbitrator found that Elite failed to meet "its burden of proving by preponderant evidence that it had just cause to terminate the employment of" Mr. Ogordi. *Id.* at 36. Specifically, the arbitrator found that the "direct testimonial evidence" provided by Elite's witnesses and Mr. Ogordi and the circumstantial evidence adduced from Elite's documents could not sustain Elite's burden of proof. *Id.* The arbitrator explained how he reached this conclusion. *Id.*

The arbitrator found that while Elite relied on the testimony of Mr. Katz and Mr. Johnson to show that Mr. Ogordi's explanation of the falsified training certification was not credible, "procedural irregularities, which occurred before and during the May 28th investigative interview, offset the ambivalence" in Mr. Ogordi's testimony at the hearing such that "just cause for his termination cannot be established." *Id.* The arbitrator noted that while Mr. Ogordi ultimately admitted to not attending the Refresher Training listed on his certification for May 16-21, 2019, there was no evidence that he had "knowingly falsified the Certification." *Id.* And the arbitrator found reason to believe that Mr. Ogordi's signature on the 2019 certification had been forged, "probably by Company Manager Peoples." *Id.*

The arbitrator expounded upon the "procedural irregularities" that denied Mr. Ogordi his due process rights under the CBA. *Id.* at 36-37. First, Elite denied Mr. Ogordi the "right to be presented with the charges against him" and an opportunity to present his side of the story before his termination. *Id.* Second, Elite conducted an "inadequate investigation," particularly with

respect to the role that Ms. Peoples may have played in the falsification of Mr. Ogordi's 2019 certification *Id.*. The arbitrator noted that Elite "relied substantially" on the interview that Ms. Sandler and Mr. Katz conducted with Mr. Ogordi on May 28, 2021, during which Mr. Ogordi purportedly gave "inconsistent explanations" for the Refresher Training certification in his file. *Id.*

The arbitrator found that the interview that Ms. Sandler and Mr. Katz conducted was "devoid of the fundamental due process protections to which Mr. Ogordi was entitled under the just cause provision of the CBA." *Id.* In making this finding, the arbitrator questioned why Mr. Katz failed to notify Mr. Ogordi in advance that the purpose of the May 28 meeting was investigative and that disciplinary charges could result. *Id.* at 37-38.

As for the "pivotal issue of whether [Mr. Ogordi] signed the fraudulent Certification," the arbitrator credited Mr. Ogordi's "consistent denials that his signature appeared on the Certification" and discredited Mr. Katz's "uncorroborated testimony that at the conclusion of the third part of the May 28th meeting Ogordi finally said, 'Oh, that's my signature.'" *Id.* at 41. The arbitrator also found that the certification document itself contained evidence that Mr. Ogordi did not sign it, and that his signature could have been forged by Ms. Peoples. *Id.* at 41-43, 45. Elite failed to properly investigate this possibility. *Id.* Instead, Elite "improperly . . . placed the burden on Ogordi to prove that he did not sign the fraudulent Certification when Major Peoples may have forged Ogordi's signature on the document." *Id.* at 42.

With regard to Mr. Ogordi's statements about his attendance at the May 2019 Refresher Training, the arbitrator found that Elite should have given Mr. Ogordi the opportunity to "correct his error" and present his "side of the story" before terminating him: "Placing the onus on Ogordi to recall a refresher training that would have occurred two years earlier, without this opportunity, was unfair." *Id.* at 43.

Relevant to the dispute about Mr. Ogordi's statements about his attendance at the May 2019 Refreshing Training and the veracity of his signature on the May 2019 certification, the arbitrator drew an adverse inference against Elite for its failure to call Ms. Sandler as a witness. *Id.* at 44. The arbitrator explained that Ms. Sandler attended the May 28 meeting and "purportedly witnessed Katz presenting the fraudulent Certification to Ogordi." *Id.* at 45. Because Ms. Sandler's testimony "could have been significant," and because Elite did not call her to testify as a witness, the arbitrator found that a negative inference was permitted. *Id.*

The arbitrator made findings on other evidentiary issues. He found that Elite's reliance "on the circumstantial evidence" of other guards "terminated based on the same charge" was not a basis to infer that Mr. Ogordi was also guilty of the charge. *Id.* at 44-46. The arbitrator also dismissed Elite's argument that Mr. Ogordi's failure to admit to legal problems during questioning diminished his credibility. *Id.* at 46-47. And the arbitrator agreed with the Union's argument that "there was no incentive for Ogordi to avoid Refresher training," which bolstered the Union's position that Mr. Ogordi had not intentionally engaged in the misconduct in question. *Id.* at 46.

The arbitrator stated his conclusion as follows:

> In the final analysis, the weight of the credible testimony, notwithstanding inconsistencies in the Grievant's testimony overcome by documentary evidence, combined with procedural irregularities, including the lack of a thorough investigation in the fraudulent preparation of the Certificate of Training, particularly the role of the Company's deceased Contract Representative, precludes the termination of the Grievant.

*Id.* at 47.

The ALJ ordered Elite to reinstate Mr. Ogordi to his prior position, effective immediately, with full back pay, seniority credit, and commensurate benefits from the date of his termination through March 22, 2022. *Id.*

### C.  Elite's Claims

In its Amended Complaint, Elite claims that the arbitrator's Opinion and Award "violates well established public policy, and the sanctity of the attorney/client relationship, is the product of misconduct by the Arbitrator, and is in manifest disregard of the law." ECF No. 20 ¶ 1. All of Elite's claims arise from the arbitrator's alleged error and misapplication of the attorney-client privilege. The crux of Elite's claims is that the arbitrator "had no authority" to "shift a burden to [Elite] to ignore Attorney Sandler's privileged communication/legal counsel status as co-counsel in the case and make an adverse inference" from Elite's failure to call Ms. Sandler as a witness. *Id.* ¶ 17. And Elite alleges that the arbitrator improperly disregarded Ms. Sandler's "ethical, legal obligations under Maryland law as a licensed member of the Maryland Bar" to comply with a rule that forbids an attorney from appearing as counsel in a case in which the attorney is likely to be a necessary witness. *Id.*¶ 19 (citing Md. Rule 19-303.7). According to Elite, the arbitrator violated a "strong public policy" against penalizing attorneys for refusing to testify about matters protected by the attorney-client privilege. *Id.* ¶ 23.

In Count I, Elite alleges that the arbitrator "engaged in misconduct and misbehavior" by sustaining an assertion of the attorney-client privilege by Elite regarding Ms. Sandler and later making an adverse inference against Elite for not calling Ms. Sandler as a witness. *Id.* ¶ 26. Elite claims the arbitrator "actively misled" it into believing that the arbitrator had accepted Ms. Sandler's "legal counsel status 'as an attorney.'" *Id.* ¶ 27. Elite claims that this alleged "misconduct and misbehavior falls squarely within the scope of 9 U.S.C. § 10(a)(3) & (4)," and "was not within the Arbitrator's authority and power under the agreement at issue." *Id.* ¶ 28.

In Count II, Elite alleges that the "Opinion and Award violates the strong public policy of Maryland and the United States generally," which is that parties should not be penalized for

asserting the attorney-client privilege. *Id.* ¶ 30. Again, Elite accuses the arbitrator of exceeding his powers or "so imperfectly executing them" as to amount to misconduct. *Id.* ¶ 31. Elite alleges that "a mutual, final, and definite award upon the subject matter was not made," such that the Opinion and Award must be vacated under 9 U.S.C. § 10(a)(3) & (4). *Id.* The thrust of the allegations in Count III are nearly identical to Count II. *Id.* ¶¶ 32-34.

In Count IV, Elite alleges that the arbitrator's Opinion and Award "fails to draw its essence" from the CBA "because of a manifest disregard of law" and its violation of "strong public policy." *Id.* ¶ 36. Elite alleges that the arbitrator "dispensed his own brand of industrial justice without regard to the terms" of the CBA "by utilizing an adverse inference" for Ms. Sandler's failure to testify as a witness for Elite. *Id.* ¶ 37. Elite seeks vacatur of the Opinion and Award under 9 U.S.C. § 10(a)(3) & (4). *Id.* ¶ 39.

In Count V, Elite alleges that the arbitrator violated "the Federal Mediation and Conciliation Service regulation, 29 C.F.R. § 1404.13," because the adverse inference the arbitrator relied on was not "based upon the evidence and testimony presented at the hearing," but rather the absence of testimony. *Id.* ¶ 41. Elite seeks vacatur of the Opinion and Award under 9 U.S.C. § 10(a)(3) & (4). *Id.*

### D.    Review of Arbitration Awards in Federal Court

Judicial review of an arbitration award is "'extremely limited,' and is, in fact, 'among the narrowest known to the law.'" *Long John Silver's Rests., Inc. v. Cole*, 514 F.3d 345 (4th Cir. 2008) (quoting *U.S. Postal Serv. V. Am. Postal Workers Union, AFL-CIO*, 204 F.3d 523, 527 (4th Cir. 2000)). A reviewing court is limited to determining "only whether the arbitrator did his job—not whether he did it well, correctly, or reasonably, but simply whether he did it." *Long John Silver's Rests.*, 514 F.3d at 349 (quoting *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*,

76 F.3d 606, 608 (4th Cir. 1996)). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

The parties agree that courts look to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, for guidance in actions brought under Section 301 of the LMRA. The Fourth Circuit has explained that the FAA limits a court's "ability to vacate arbitral awards as part of its comprehensive scheme to replace judicial hostility to arbitration with a national policy favoring it." *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 478 (4th Cir. 2012) (citing *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008)). A court may not "overturn an arbitral award just because it believes, however strongly, that the arbitrators misinterpreted the applicable law." *Id.* at 478 n.5 ("When parties consent to arbitration, and thereby consent to extremely limited appellate review, they assume the risk that the arbitrator may interpret the law in a way with which they disagree."). The party seeking to vacate the arbitration award "must sustain the heavy burden of showing one of the grounds specified in the Federal Arbitration Act or one of certain limited common law grounds." *Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007).

Pertinent to this case, under 9 U.S.C. § 10(a)(3), an arbitration award may be vacated "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." *Wachovia*, 671 F.3d at 478-79. Under § 10(a)(4), the Court may vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). And under the

common law, "grounds for vacating such an award include those circumstances where an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law." *Three S Delaware*, 492 F.3d at 527 (internal quotation marks omitted).

### E.    The Attorney-Client Privilege

"The attorney-client privilege is designed to 'encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Rein v.U.S. Pat. & Trademark Off.*, 553 F.3d 353, 375 (4th Cir. 2009) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The privilege "extends to all situations in which an attorney's counsel is sought on a legal matter." *Id.* (citation omitted). It "protects not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* (internal quotation marks and citation omitted). "[I]f a party demonstrates that attorney-client privilege applies, the privilege affords all communications between attorney and client absolute and complete protection from disclosure." *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 291 (4th Cir. 2004) (quoting *In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997)).

In general, the proponent of the privilege bears the burden to show that an attorney-client relationship existed between the parties to the communication, that the communication was privileged, and that the privilege has not been waived. *See United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982). The party asserting the privilege must demonstrate:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997) (citations omitted); *see also In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 339 n.3 (4th Cir. 2005).

### F.    Elite's Complaint Must Be Dismissed

Elite's Complaint must be dismissed because it does not state a plausible claim that the arbitrator's Opinion and Award is subject to vacatur for any basis under the FAA or the common law. *See Teamsters Loc. No. 355 v. Sysco Baltimore, LLC*, No. CCB-18-1410, 2019 WL 2290523, at *3 (D. Md. May 29, 2019) (dismissing complaint brought under Section 301 of the LMRA because it did not state a plausible claim that the arbitrator committed an error that would warrant vacatur of the award). Having considered Elite's allegations and the arbitrator's Opinion and Award, the Court cannot find that the arbitrator was not "arguably construing or applying the [CBA] and acting within the scope of his authority." *See Brown & Pipkins, LLC v. Service Employees Int'l Union*, 846 F.3d 716, 723 (4th Cir. 2017) (internal quotation marks omitted).

### 1.    Misconduct and Misbehavior (Count I)

As for the arbitrator's alleged "misconduct and misbehavior" in forming an adverse inference against Elite for its failure to call its attorney of record, Ms. Sandler, as a witness during the arbitration, the Court cannot find that this purported misconduct is so serious as to require vacatur. First, the Court finds it implausible that the arbitrator, rather than Ms. Sandler, violated the policy underlying Md. Rule 19-303.7. This rule states that "[a]n attorney shall not act as advocate at a trial in which the attorney is likely to be a necessary witness" unless the attorney's testimony relates to an uncontested issue or the nature and value of legal services rendered in the case, or if the disqualification of the attorney "would work substantial hardship on the client." Md. Rule 19-303.7. Ms. Sandler participated in the three-part meeting with Mr. Ogordi and Mr. Katz. She witnessed what happened during the meeting: what Mr. Ogordi said, what Mr. Katz said, and

how Mr. Ogordi was permitted to review the 2019 certification. Ms. Sandler witnessed the events that gave rise to Mr. Ogordi's termination. These events were at the heart of grievance before the arbitrator, and the parties disagreed about what happened. Ms. Sandler's testimony was likely to have been necessary during the arbitration hearing. Ms. Sandler's status as an attorney did not immunize her from being called as a fact witness. In fact, the inverse is true: because Ms. Sandler was a witness to events that could have made her testimony during the arbitration hearing necessary, she was probably precluded under Rule 19-303.7 from representing Elite during the arbitration.[2] Still, Ms. Sandler made the confounding decision to appear as counsel for Elite when she was a witness to the very facts that were the subject of the proceeding. For these reasons, Elite has not plausibly alleged that the arbitrator disregarded Ms. Sandler's "ethical [and] legal obligations under Maryland law . . . to comply with Rule 19-303.7." ECF No. 20 ¶ 19.

The same goes for Elite's claim that the arbitrator's Opinion and Award stands in violation of the attorney-client privilege. The arbitrator committed no error in this regard. The facts that Ms. Sandler might have recalled about Mr. Ogordi and Mr. Katz's statements and conduct during the May 28 meeting are not protected by the attorney-client privilege. As for whatever Mr. Ogordi said and did during the May 28 meeting, there is no allegation that Ms. Sandler represented him at the time or that any communications were made in confidence for the purpose of seeking legal advice. And whatever Mr. Katz said and did during the meeting (at least the parts of it that matter, when Mr. Ogordi was in attendance) was in front of a third party, Mr. Ogordi, which would operate as a waiver of the privilege. Certainly, Ms. Sandler might have formed mental impressions of the events that transpired during the meeting that could be protected from disclosure as attorney work

---

[2] The Court is not suggesting that Ms. Sandler violated any ethical rule. It may be that she did not believe she would "likely" be a necessary witness (in light of Mr. Katz's availability to testify). But to the extent that any violation of the rule occurred, it was not the fault of the arbitrator.

product. And she may have been part of communications with Mr. Katz that were made in confidence and for the purpose of legal advice; these communications would be privileged. But had Ms. Sandler testified during the arbitration about the non-confidential matters that she observed during the May 28 meeting, doing so would not have violated the attorney-client privilege.[3] Elite's failure to call Ms. Sandler as a witness to the events of the May 28 meeting was precisely what the arbitrator found to be a basis for imposing an adverse inference against Elite. The arbitrator's decision in this regard is no basis to vacate the Opinion and Award.

But even if the arbitrator was wrong in making an adverse inference against Elite, this would still not be a basis to vacate the arbitrator's Opinion and Award. The arbitrator credited the testimony of Mr. Ogordi over the testimony of Mr. Katz, partly because Mr. Katz's testimony was uncorroborated. But this was not the only reason that the arbitrator found for the Union. His decision was also based on the slipshod investigation that Elite conducted through Ms. Sandler and Mr. Katz. Accordingly, even if the arbitrator committed error by imposing an adverse inference against Elite, because the arbitrator would have reached the same decision without this adverse inference, this is no basis to vacate the Opinion and Award. Elite has not plausibly alleged that any error by the arbitrator was serious enough to constitute misconduct and misbehavior.

## 2.    Public Policy (Counts II and III)

Elite has also failed to state a plausible claim that the arbitrator's Opinion and Award should be vacated on the basis of the arbitrator's alleged violation of public policy. There is no

---

[3] Both Elite and the arbitrator have demonstrated confusion about when the attorney-client privilege applies. Communications are protected by the privilege, not attorneys. Ms. Sandler's recollection of non-confidential communications may be the subject of inquiry without violation of the attorney-client privilege. It does not matter that Ms. Sandler was acting as Elite's attorney when she observed the non-confidential communications. If the communications were not made in confidence for the purpose of legal advice, they are not privileged.

"broad judicial power to set aside arbitration awards as against public policy." *Westvaco Corp. v. United Paperworkers Int'l Union, AFL-CIO ex rel. Loc. Union 676*, 171 F.3d 971, 976 (4th Cir. 1999) (quoting *Misco*, 484 U.S. at 43). Courts may only vacate an arbitration award that "violates some explicit public policy" that is "well defined and dominant," and which can be "be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westvaco*, 171 F.3d at 976 (quoting *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983)).

Elite has not plausibly alleged that the arbitrator violated any "explicit public policy" that is both "well defined and dominant" and which can "be ascertained by reference to the laws and legal precedents." *Id.* The Court agrees that the attorney-client privilege is an important public policy that must be defended against incursion. But, as explained above, Elite has failed to plausibly allege that the arbitrator violated the attorney-client privilege, or any other attendant public policy so well-defined that might warrant vacatur. Alternatively, even if the arbitrator violated the attorney-client privilege in forming the adverse inference against Elite, the Opinion and Award was not solely based on this supposed error. Accordingly, Elite has not plausibly alleged that vacating the Opinion and Award is required to vindicate public policy.

### 3.    Manifest Disregard (Count IV)

Elite has also failed to state a plausible claim that the Opinion and Award could be vacated for various procedural irregularities, including the arbitrator's purported failure to comply with the governing regulations, to warn Elite that he might draw an adverse inference against its failure to call Ms. Sandler as a witness, and by his drawing of an adverse inference against Elite.

An arbitrator retains broad discretion over procedural matters and decisions about the admissibility of evidence. *Wachovia*, 671 F.3d at 479 (citing *Int'l Union, United Mine Workers v.*

*Marrowbone Dev. Co.*, 232 F.3d 383, 389 (4th Cir. 2000)). An "arbitrator's procedural ruling may not be overturned unless it was in bad faith or so gross as to amount to affirmative misconduct." *Marrowbone*, 232 F.3d at 390. An arbitrator's unintentional mistake on a procedural matter is not a basis for vacatur. *Wachovia*, 671 F.3d at 479.

Further, "'in making evidentiary determinations,' arbitrators 'need not follow all the niceties observed by the federal courts.'" *White v. Four Seasons Hotel & Resorts*, 244 F. Supp. 3d 1, 4 (D.D.C. 2017) (quoting *Howard Univ. v. Metro. Campus Police Officer's Union*, 512 F.3d 716, 721 (D.C. Cir. 2008)); *Howard Univ. v. Metro. Campus Police Officer's Union*, 519 F. Supp. 2d 27, 36 (D.D.C. 2007) ("It is well settled that the arbitrator is the judge of the admissibility and relevancy of evidence submitted in an arbitration proceeding."). "Ultimately, all that is required is that the arbitrator grant the parties a fundamentally fair hearing." *White*, 244 F. Supp. 3d at 5 (internal quotation marks omitted). "A fundamentally fair hearing requires only notice, opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decision makers are not infected with bias." *Id.*

Elite has not plausibly alleged that the arbitrator made any error here. As explained above, the arbitrator had broad discretion to make rulings on evidence and on matters of the attorney-client privilege. There is no plausible allegation, and no indication from the arbitrator's Opinion and Award, that the arbitrator intentionally ignored or disregarded the law on these matters. *See Wachovia*, 671 F.3d at 483 (explaining that a party must satisfy a two-part test for a reviewing court to vacate for manifest disregard: (1) the applicable legal principle was clearly defined and not subject to reasonable debate; and (2) the arbitrator nonetheless refused to heed that legal principle). The Court rejects Elite's argument that the arbitrator was required to cloak Ms. Sandler with some unrecognized form of attorney-client privilege because the arbitrator had sustained a

separate invocation of the attorney-client privilege by Elite. As the Court has explained, communications, not persons, are protected by the attorney-client privilege. Ms. Sandler was present in her role as an attorney during the meeting with Mr. Ogordi. She witnessed what happened. The events that she witnessed are not themselves privileged. The arbitrator made no error by imposing an adverse inference for Ms. Sandler's failure to testify.

But even if the arbitrator was mistaken, any error is not serious enough to warrant vacatur because it does not amount to misbehavior, misconduct, or the manifest disregard of established law. The arbitrator did not penalize Elite for asserting the attorney-client privilege, which would have been improper. *See In re Tudor Assocs., Ltd., II*, 20 F.3d 115, 120 (4th Cir. 1994) ("A negative inference should not be drawn from the proper invocation of the attorney-client privilege."). Instead, the arbitrator appropriately drew an adverse inference against Elite for its failure to call Ms. Sandler as a witness to non-privileged communications.

### 4.   FMCS Regulation

Elite has failed to state a plausible claim that the arbitrator's Opinion and Award must be vacated because of a violation of 29 C.F.R. § 1404.13. Under the CBA, the arbitrator was required to handle the arbitration in accordance with the "Voluntary Rules of Labor Arbitration" of the FMCS. ECF No. 1-3 at 16. These rules say little about how an arbitrator must conduct hearings:

> All proceedings conducted by the arbitrators shall conform to the contractual obligations of the parties, and to the Code. The arbitrator shall comply with § 1404.4(b). The conduct of the arbitration proceeding is under the arbitrator's jurisdiction and control, and **the arbitrator's decision shall be based upon the evidence and testimony presented at the hearing or otherwise incorporated in the record of the proceeding**. The arbitrator may, unless prohibited by law, proceed in the absence of any party who, after due notice, fails to be present or to obtain a postponement. An award rendered in an ex parte proceeding of this nature must be based upon evidence presented to the arbitrator.

29 C.F.R. § 1404.13 (emphasis added).

Elite alleges that by drawing an adverse inference against it, the arbitrator's decision was based in part "on the absence of [Ms. Sandler's] testimony" rather than on testimony provided during the hearing. ECF No. 20 ¶ 41. This allegation conflicts with the elementary principles of evidence and burdens of proof that underlie our adversarial system. Elite had the burden to prove that it terminated Mr. Ogordi for good cause. The arbitrator was well within his rights to draw a negative inference against Elite for its failure to call Ms. Sandler as a witness to the events at the May 28 meeting with Mr. Ogordi and Mr. Katz. *See, e.g.*, *Howard Univ.*, 512 F.3d at 723 (citing *Hoxie v. DEA*, 419 F.3d 477, 483 (6th Cir. 2005) ("[A] negative inference can be drawn from a failure to testify in civil proceedings")). Even assuming that the arbitrator committed error by drawing a negative inference against Elite, this error does not "approach in gravity the type of error that justifies vacating an arbitration award for misconduct." *Id.* Ms. Sandler was not called to testify and would have had no valid basis to assert the attorney-client privilege regarding non-confidential communications during the May 28 meeting with Mr. Ogordi and Mr. Katz. Because the arbitrator properly drew an adverse inference against Elite, Elite's Amended Complaint does not state a plausible claim that the Opinion and Award must be vacated for violation of the FMCS regulations.

### G.    Confirmation of Award

The Union seeks an order confirming the arbitrator's Opinion and Award. ECF No. 22-1 at 15. Elite argues that the Union's "petition" for confirmation of the arbitrator's Opinion and Award is procedurally improper because this case is before the Court under Section 301 of the LMRA, not under the FAA. ECF No. 24 at 7. Elite also argues that the Union's failure to file a copy of the CBA and the arbitrator's Opinion and Award warrants denial of the Union's request for confirmation. *Id.* at 8-9. The practical effect of the Court's dismissal of Elite's Amended

Complaint will be the confirmation of the arbitrator's Opinion and Award. All parties have received fair notice of the Union's intention to have this Court confirm the arbitrator's Opinion and Award. And copies of all relevant documents, including the CBA and the arbitrator's Opinion and Award, have been filed in this case. The Court sees no reason not to issue an order confirming the award, as requested by the Union. At least one other Court did just this under similar procedural circumstances. *See Howard Univ.*, 519 F. Supp. 2d at 36.

### H. Attorney's Fees

The Union requests that the Court grant it an award of attorney's fees and costs as compensation for "the expense and delay caused by Elite's unjustified challenge to the Arbitrator's Award." ECF No. 22-1 at 16. Elite opposes the request. ECF No. 24 at 24-25. Although the Court has found that Elite failed to present plausible claims for the vacatur of the arbitrator's Opinion and Award, the Court does not find that Elite's claims and the positions it took in its response to the Motion are so frivolous as to be entirely without justification. *See Westvaco*, 171 F.3d at 978 n.3 (4th Cir. 1999) ("Because Westvaco did not challenge the arbitration award 'without justification,' however, we deny the union's motion for attorneys' fees."); *United Food & Com. Workers, Loc. 400 v. Marval Poultry Co.*, 876 F.2d 346, 350 (4th Cir. 1989) (explaining that actions pursued "without justification" are those that can be construed as "vexatious" or as "willful disobedience of a court order").

## IV. Conclusion

For the reasons stated above, the Union's Motion to Dismiss (ECF No. 22) is granted in part and denied in part. Elite's Amended Complaint (ECF No. 20) is dismissed with prejudice. The Opinion and Award issued by arbitrator Robert T. Simmelkjaer on March 22, 2022, is confirmed. The Union's request for an award of attorney's fees and costs is denied.

A separate order follows.


Date: February 23, 2023                    _____/s/_____
                                           Timothy J. Sullivan
                                           United States Magistrate Judge